1

2

3

4

## UNITED STATES DISTRICT COURT

5

### DISTRICT OF NEVADA

6

| U.S. EQUAL EMPLOYMENT | ) |
| OPPORTUNITY COMMISSION, | ) |

7

Plaintiff,

8

vs.

9

WEDCO, INC., a foreign corporation,

10

Defendant.

11

3:12-cv-00523-RCJ-VPC

**ORDER**

12

13        This case arises from Defendant Wedco, Inc.'s ("Wedco") alleged violation of Title VII

14   of the Civil Rights Act of 1964 ("Title VII").  Pending before the Court is Wedco's Motion for

15   Summary Judgment (ECF No. 108) and its Motion to Seal (ECF No. 106) portions of the

16   summary judgment motion.  Plaintiff United States Equal Employment Opportunity Commission

17   ("EEOC") has also filed a Motion for Summary Judgment on Wedco's Equitable Affirmative

18   Defenses (ECF No. 109) and a Motion for Summary Judgment on Wedco's Procedural

19   Affirmative Defenses (ECF No. 110).  The Court has heard oral arguments and is now prepared

20   to make its ruling.

21   **I.        BACKGROUND**

22        Wedco is an electrical parts distributor that operates in Northern Nevada.  It is of

23   moderate size with approximately sixty employees. (Stoltz Dep. 55:2–4, Ex. 1, ECF No. 108-1).

24

Larry Mitchell is an African-American who worked for Wedco from October 2007 to July 25, 2008, initially as a temporary stocker in the warehouse and then as a full-time deliveryman. (Mitchell Dep. 61:24–62:12, 74:25–76:5, ECF No. 117-4).  During his short time at Wedco, Mitchell was perceived as a good employee by his supervisor, Michael Potter. (Potter Dep. 74:22–75:4, Ex. 2, ECF No. 108-1).  Mitchell received a pay increase and was even offered a promotion, which he turned down. (*Id.* at 193:1–15).  Mitchell was given time off when requested, (Potter Dep. 137:16–25), and he generally had an amicable relationship with most of his co-workers at Wedco. (*See* Mitchell Dep. 113:23–114:1 (planning a fishing trip with his co-workers); Gil Decl. ¶ 4, ECF No. 117-18 (visiting co-workers in receiving area to socialize)).

Near the beginning of Mitchell's employment, he noticed a hangman's noose hanging in the receiving area of Wedco's warehouse. (Mitchell Dep. 153:16–18).  The noose allegedly disturbed Mitchell, though he said nothing because he believed it to be merely a Halloween decoration. (*Id.* at 70:15–24).  The noose was not taken down after the holiday, however.  As time passed, Mitchell saw the noose whenever he chose to visit the receiving area. (Mitchell Dep. 71:16–19; Gil Decl. ¶ 4).  Mitchell never expressly complained about the noose to Potter or to April Martin, Wedco's Human Resources representative, nor did he indicate that he believed the noose held racial meaning. (Mitchell Dep. 400:4–403:10; Martin Dep. 145:15–25, ECF No. 108-1; Potter Decl. ¶ 10, Ex. 21, ECF No. 108-10).  Instead, Mitchell secretly took pictures of the noose in front of a calendar so that he could track the months it hung in the warehouse. (Mitchell Dep. 181:7–10).  At one point, Mitchell threw the noose away only to have it reappear in the same location. (Mitchell Dep. 150:2–4).  Nevertheless, he still did not report his feelings about the noose to anyone at Wedco with supervisory authority. On another occasion, while Wedco employees were milling about the receiving bay, Mitchell made the comment that

1    "someone should throw it away." (*Id.* 400:4–403:10).  Mitchell claims he was referring to the

2    noose and that Potter was present at the time, but Mitchell is unsure whether Potter heard or

3    understood the comment. (*Id.*).

4         The EEOC alleges that on at least one occasion, Jacob Wilson ("Wilson"), Mitchell's

5    co-worker at Wedco, told Mitchell that "this noose is for you." (Mitchell Dep. 150:18–151:4).

6    Mitchell again did not report this incident to Potter, Martin, or any other Wedco authority.

7    (Mitchell Dep. 155:2–22).  Wilson's position at Wedco was that of "lead-man," which means he

8    organized delivery schedules and interacted with Mitchell on a daily basis. (Wilson Dep. 262:2–

9    24, Ex. 6, ECF No. 108-4).  Wilson allegedly antagonized Mitchell on a routine basis.  Mitchell

10   claims that Wilson was "rude" and that he treated Mitchell "like shit." (Mitchell Dep. 293:17–20,

11   305:24–306:1).  For example, the EEOC alleges that Wilson denied Mitchell breaks, required

12   him to ask permission to use the restroom, and moved his cellphone to another location. (Compl.

13   ¶ 13).  Mitchell also claims that Wilson screamed profanity at him at least once, and that he

14   kicked a "spool" over that Mitchell was loading onto his delivery truck. (Mitchell Dep. 290:20–

15   25, 299:7–9).  In contrast to his response to the noose, Mitchell reported Wilson's obnoxious

16   behavior to Potter multiple times. (*Id.* at 290:17–19, 291:19–21, 293:13–16).  After each report,

17   Potter called Wilson in to discuss his behavior, after which Wilson's behavior would improve for

18   a few days. (*Id.* at 291:11–292:7).  Mitchell even invited Wilson to go fishing on one occasion,

19   but Wilson turned him down. (*Id.* at 113:14–20).  Mitchell was allegedly informed later that

20   Wilson told a third-party that he was "not going to go fishing with no nigger." (Mitchell Dep.

21   114:4–6).  In Mitchell's presence, Wilson used the word "nigger" only once, when he was

22   speaking about a homeless man outside Wedco's building. (*Id.* at 115:18–116:10).  However,

23

24

Wilson allegedly had a propensity to tell racial jokes, though those jokes were not directed at

Mitchell and were also not made in Mitchell's presence. (Gil Decl. ¶ 6).

On July 25, 2008, Mitchell was preparing to leave the Wedco facility with a delivery

when he was stopped by Todd Baker ("Baker"), another Wedco employee. (Baker Decl. ¶ 5, Ex.

17, ECF No. 108-9).  Baker asked whether Mitchell had reviewed the paperwork related to the

delivery. (*Id.* ¶ 6).  Believing that Baker was simply giving him a hard time, Mitchell made the

comment that he ought to hit Baker with a forty pound concrete lid that Mitchell was carrying at

the time. (Mitchell 269:16–21).  Wilson overheard the comment and insisted that the two go talk

to Martin. (Wilson Dep. 187:2–22).  Mitchell refused to accompany Wilson to Martin's office

and instead voluntarily left the premises. (Mitchell Dep. 269:22–270:7).

On August 21, 2008, Mitchell submitted an "Intake Inquiry Form" to the Nevada Equal

Rights Commission ("NERC") claiming that Wedco had discriminated against him based on his

race, color, and age. (Intake Inquiry Form, Ex. 14, at 247, ECF No. 108-7).  In the Form,

Mitchell claimed that Wilson "would find any reason to harass [him]" and that Wilson would tell

Mitchell that the "hangs man noose [was] for [him]." (*Id.* at 250).  After meeting with an NERC

intake offer, Mitchell filed his formal Charge of Discrimination ("Charge") against Wedco with

the NERC. (Charge of Discrimination, ECF No. 108-2).  The Charge included four allegations

against Wedco: (1) that Wilson moved Mitchell's phone so that their cellphones would not be

next to one another; (2) that Mitchell was denied breaks; (3) that he was required to ask

permission to use the bathroom; and (4) that a hangman's noose was displayed in the work area.

(*Id.* at 6).  Upon receiving the Charge, Wedco's Vice-President removed the noose and threw it

away. (Stoltz Dep. 92:11–21).  Wedco also responded to the Charge by denying the allegations

of discrimination and harassment contained therein.  After completing its investigation, the

NERC transferred Mitchell's case to the EEOC.  The EEOC then conducted an interview with Mitchell and determined that his complaints against Wedco had merit.  Wedco and the EEOC engaged in conciliation negotiations, but when an agreement could not be reached, the EEOC decided to bring a lawsuit against Wedco.

On September 27, 2012, the EEOC filed its complaint alleging that Wedco subjected Mitchell to "harassment and disparate treatment on the basis of his race" constituting a racially hostile work environment, which led to Mitchell's constructive discharge. (Compl. ¶ 13).  Wedco initially moved for dismissal of the claims, which this Court denied. (ECF No. 17).  Wedco now seeks summary judgment on the entirety of the case while the EEOC requests summary judgment on a number of Wedco's affirmative defenses.

## II.    LEGAL STANDARD

A principal purpose of the summary judgment rule is to "isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  A court grants summary judgment only if "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In making this determination, the court "must draw all reasonable inferences supported by the evidence in favor of the non-moving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002).  "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  Rather, only genuine issues of *material* facts are relevant to the summary judgment analysis.  A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* at 248.  "The moving party bears the initial burden of establishing the absence of a genuine issue of material

fact." *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531 (9th Cir. 2000).  The burden is met by demonstrating to the court "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325.  This is done by citing to depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials. Fed. R. Civ. P. 56(c)(1)(A).  Once the initial burden is met, however, "Rule 56(e) requires the nonmoving party to go beyond the pleadings and identify facts which show a genuine issue for trial." *Fairbank*, 212 F.3d at 531.

Moreover, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.  "In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23.  This causes the moving party to be entitled to judgment as a matter of law because the non-moving party failed to sufficiently show facts supportive of an essential element of the case for which she bears the burden of proof. *Id.* at 323.  Conversely, where reasonable minds could differ on the facts proffered in support of a claim, summary judgment should not be granted.  *Petzak v. Nevada ex rel. Dep't of Corr.*, 579 F. Supp. 2d 1330, 1333 (D. Nev. 2008).  "Summary judgment is inappropriate if reasonable jurors . . . could return a verdict in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008).

## III.    Wedco's Motion for Summary Judgment

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms,

6

conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  Discrimination can take the form of negative employment action, or it may arise when an employer harbors a hostile or abusive work environment. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).  Indeed, Title VII is violated when "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment.'" *Id.* (internal quotation omitted) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67 (1986)).  Title VII is not, however, a "general civility code" for the workplace. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998).

The EEOC alleges that Wedco created a racially hostile work environment by allowing a noose to hang in its receiving office and by allegedly allowing Wilson to engage in racially-charged behavior.  The EEOC also asserts that Mitchell was constructively discharged from his employment and suffered disparate treatment because of his race.  Wedco maintains that Mitchell never reported his feelings regarding the racial nature of the noose such that it was not aware of the noose's effect on him.  Further, Wedco argues that the contentious relationship between Mitchell and Wilson was based on personal disagreements rather than racial animus, and Mitchell failed to report that Wilson's actions contained racial implications.

### A. Hostile Work Environment

To prevail on a hostile work environment claim under Title VII, the plaintiff must show: "(1) that he was subjected to verbal or physical conduct of a racial or sexual nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment." *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 640 (9th Cir. 2003).  In addition to showing a hostile work

environment, the plaintiff must also demonstrate that "[the employer] is liable for the harassment." *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1118 (9th Cir. 2004).  When determining whether the racial hostility in a work environment is so severe or pervasive as to violate Title VII, the court considers "all the circumstances" including the "frequency of discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 1113; *see also Harris*, 510 U.S. at 23 (listing these factors).  Moreover, "the working environment must both subjectively and objectively be perceived as abusive by the plaintiff." *Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 2000).  Allegations of a racially hostile workplace "must be assessed from the perspective of a reasonable person belonging to the racial or ethnic group of the plaintiff." *McGinest*, 360 F.3d at 1115.  And while a single incident is usually insufficient to demonstrate a hostile work environment, if the harassment is more severe, there is less need for the plaintiff to show a series of incidents. *Brooks*, 229 F.3d at 926.  In the present case, the EEOC provides sufficient evidence of disputed facts to convince the Court that summary judgment is not proper on this claim.

## 1.    Whether the alleged harassment was sufficiently severe or pervasive to alter Mitchell's working conditions is a question for the jury.

As an initial matter, there is likely no dispute for summary judgment purposes that Mitchell suffered some conduct of a racial nature that was unwelcome.  While the parties argue over the intrinsic meaning of the noose that hung in Wedco's warehouse, they do not dispute that Mitchell heard Wilson use the term "nigger" on at least one occasion.  The word "nigger" is one of the most nefarious slurs in the English language that carries with it "a history of racial violence, brutality, and subordination." *McGinest*, 360 F.3d at 1116.  The Court finds that it is

without question that a reasonable African-American would consider it unwelcome to hear a

co-worker use the term in a derogatory manner even if not directed at him, and Mitchell testified

that he found it subjectively offensive. (Mitchell Dep. 71:15).  The EEOC has therefore satisfied

the first two prongs of the hostile work environment analysis.

Nevertheless, Wedco contends that the EEOC provides insufficient evidence that the

alleged racial conduct was so severe or pervasive that it altered Mitchell's working conditions.

Once stripped of exaggeration, the totality of EEOC's contentions is that Mitchell suffered a

hostile work environment because a hangman's noose was displayed in Wedco's warehouse,

Wilson said the word "nigger" in Mitchell's presence on one occasion, and Wilson allegedly told

Mitchell at least once that "this noose is for you."  Mitchell also testified in his deposition that he

was told by co-workers that Wilson referred to him as a "nigger" more than once when Mitchell

was not around.  Wedco responds that the noose was not intended to be racially offensive and

was not meant to harass Mitchell.  Wedco also argues that Wilson's conduct was not facially

racial and that there is no indication that Mitchell actually suffered racial harassment.

As to the noose, the Court agrees that its mere presence does not necessarily create a

hostile work environment.  However, where a noose is displayed in the workplace and is "aimed

at" a particular employee, a Title VII claim may arise. *See Ballard v. Portland Gen. Elec.*, No.

05-CV-57-BR, 2006 WL 19194, at *6 (D. Or. Jan. 4, 2006) (finding no hostile work

environment because no evidence that noose was "aimed at or intended to be seen" by the

plaintiff).  For instance, in *Henry v. Regents of the Univ. of Cal.*, No. C 12-5818 PJH, 2014 WL

709971, at *14 (N.D. Cal. Feb. 24, 2014), the court considered whether a supervisor's alleged

hanging of a noose in the workplace was sufficient evidence of severe or pervasive harassment to

constitute a hostile work environment.  The court concluded that even when considered with the

1    supervisor's comment that the department was "not going to let a black man manage anybody,"

2    the evidence could not withstand summary judgment. *Id.* at *15.  The court found that there was

3    no evidence that the noose was "directed at [the plaintiff] personally" or that "the noose served

4    as a threat of violence to him specifically." *Id.*  Had there been such evidence, then the court

5    indicated it may have agreed that the severity of the incident supported the plaintiff's hostile

6    work environment claim. *Id.* (citing *Brooks*, 229 F.3d at 926).  Applying similar reasoning, the

7    court in *Ferguson v. Walmart*, No. CV 12-04434 RSWL, 2014 WL 24139, at *9 (C.D. Cal. Jan.

8    2, 2014), held that summary judgment on a hostile work environment claim was not warranted

9    where the plaintiff alleged that a noose was hung on his forklift.  There was little dispute as to

10   whether the noose was intended to harass the plaintiff since it was allegedly accompanied with

11   racial slurs directed at the plaintiff by his co-workers. *Id.*

12          In this case, there is not a genuine dispute that the noose was hanging in the receiving

13   office long before Mitchell was hired.  Potter testified that the noose was there when Potter was

14   first hired in 2006, and Mitchell testified that he noticed the noose on his second day at Wedco.

15   (Potter Dep. 155:11–21; Mitchell Dep. 70:15–19).  The EEOC thus cannot legitimately argue

16   that there is a disagreement over whether Wilson created the noose to harass or intimidate

17   Mitchell.  Nonetheless, just because the noose was not originally created with dubious intent

18   does not mean that it could not be imputed with racial significance by Wilson's subsequent

19   conduct.  When Wilson allegedly told Mitchell that "this noose is for you," he took an object

20   that, as it appears from the record, was otherwise devoid of racial meaning and directed or aimed

21   it at his African-American co-worker.  Together with the additional context of Wilson's use of

22   the word "nigger" and Wilson's alleged disparagement of Mitchell to other co-workers, the

23   Court cannot say that a juror would be unreasonable to find that the noose was sufficiently severe

24

or pervasive as to create a hostile work environment.  Rather, the Court finds that a jury should be given the opportunity to evaluate the credibility of the witnesses in this case to determine whether the noose's presence altered Mitchell's work environment.

Further, based on Wilson's use of the word "nigger" in Mitchell's presence and Mitchell's understanding that Wilson referred to him as a "nigger" to his co-workers, it is possible that Mitchell perceived Wilson's other alleged behavior as racially motivated.  For example, Wilson allegedly moved Mitchell's work phone so that his phone and Mitchell's phone would not be next to one another.  A reasonable inference from this conduct could be that Wilson did not want his phone next to Mitchell's because of Mitchell's race.  The yelling of profanity and Wilsons' antagonizing conduct could also be interpreted as motivated by racial animus, contributing to a racially hostile work environment.  Therefore, the Court finds that a jury should be tasked with determining whether a reasonable African-American would find Mitchell's workplace so objectively and subjectively racially hostile as to create an abusive working environment.

### 2.   A genuine dispute of material facts exists regarding Wedco's knowledge of the alleged harassment.

The Court also finds that a genuine dispute of material facts exists as to Wedco's liability for the alleged harassment.  The appropriate analysis for deciding an employer's liability under Title VII is determined by whether the alleged harasser was the plaintiff's supervisor or co-worker. *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2439 (2013).  On the one hand, an employer is vicariously liable for a supervisor's creation of a hostile work environment. *Id.* at 2441.  The Supreme Court recently defined "supervisor" for Title VII purposes as an employee "empowered by the employer to take tangible employment actions against the victim." *Id.* at

2439.  Tangible employment actions include hiring, firing, demoting, promoting, transferring, or disciplining the victim. *Id.* at 2443.  Moreover, "[i]f the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable." *Id.* at 2439.  If no tangible employment action is taken, however, "the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventative or corrective opportunities that the employer provided." *Id.*

On the other hand, if the alleged harasser is the victim's co-worker, "the employer is liable only if it was negligent in controlling working conditions." *Id.*  In such cases, the plaintiff must show that the employer knew or reasonably should have known about the harassment but failed to take remedial action." *Id.* at 2441.  "Evidence that an employer did not monitor the workplace, failed to respond to complaints, failed to provide a system for registering complaints, or effectively discouraged complaints from being filed would be relevant" in determining whether the employer failed to prevent  or remedy a racially hostile environment. *Id.* at 2453.

In its complaint, the EEOC originally alleged that Wilson was Mitchell's supervisor.  As a matter of law, that is incorrect.  It is undisputed that Wilson did not have authority to fire Mitchell, discipline him, or even recommend to Potter that Mitchell be disciplined. (Potter Dep. 49:13–23; Wilson 71:20–24).  Although he stepped in for Potter at the warehouse when Potter was absent, Wilson only ensured that things ran smoothly, he did not have any other supervisory authority.  Wilson, therefore, was not Mitchell's "supervisor" under Title VII. *See Vance*, 133 S. Ct. at 2439.  Accordingly, Wedco can be liable for Wilson's alleged racially hostile behavior only if "it knew of should of known of the conduct and failed to act." *Id.* at 2441.

The record before the Court does not demonstrate that Wedco had any actual knowledge of the alleged hostile behavior.  Mitchell never reported Wilson for using the word "nigger" or for telling racial jokes.  The instances when Mitchell did complain about Wilson's behavior, Potter called Wilson in and discussed the matter with him.  Because Mitchell never claimed that his race was the reason Wilson patronized him, Potter did not have direct evidence of Wilson's allegedly race-based conduct.  In any event, Mitchell concedes that each time he reported Wilson's actions, Potter would speak to Wilson and things would improve for a few days. (Mitchell 291:19–292:7).  After one such report, Wilson even went so far as to apologize to Mitchell for his behavior. (*Id.*).  The Court, therefore, concludes that a reasonable juror would not find that Wedco had actual knowledge of the alleged discrimination.

However, the EEOC contends that Wedco had constructive knowledge of Wilson's racially offensive conduct.  Or in other words, the EEOC argues that Wilson's actions were so open and notorious that Wedco "should have known" about the harassment. *McGinest*, 360 F.3d at 1119.  On a motion for summary judgment, the district court does not "weigh the evidence and determine the truth of the matter." *See Anderson*, 477 U.S. at 249.  Rather, the court must limit its review to determining whether "there is a genuine issue for trial." *Id.*  In this case, Potter spent considerable time in the warehouse performing his managerial duties.  As part of those duties, he issued performance reviews for the warehouse employees.  In one such review during the time relevant to this litigation, Potter instructed Wilson to "[t]ry not to joke around as much with the warehouse crew.  You never know how someone else will take it." (Wilson Review, ECF No. 117-19).  In Potter's deposition he admitted that he observed Wilson joking around, though he could not remember the nature of the jokes that Wilson told. (Potter Dep. 90:21–25).  Further, at least one Wedco employee recalls Wilson "mak[ing] jokes about racial stereotypes,"

1   though never in Mitchell's or Potter's presence. (Gil Decl. ¶ 6).  A reasonable inference that

2   could be drawn from these facts is that Potter overheard or was informed that Wilson told

3   inappropriate jokes, which caused Potter enough concern that he addressed it in a performance

4   review.  Given the evidence that Wilson told racial jokes, it would even be reasonable to infer

5   that Mitchell was the "someone" to whom Potter was referring.

6        Moreover, Mitchell visited Potter at least twice to complain about Wilson's behavior, and

7   while Mitchell never explicitly stated that that he thought the conduct was race based, a

8   reasonable juror could find that the performance review together with Wilson's reputation should

9   have put Potter on notice that Wilson's conduct arose from more than just a personality conflict.

10  *See Vore v. Ind. Bell Tel. Co.*, 32 F.3d 1161, 1162 (7th Cir. 1994) (stating that personality

11  conflicts that are unrelated to racial hostility do not support a Title VII hostile work environment

12  claim).  If Potter suspected that Wilson was racially harassing Mitchell in any way and failed to

13  investigate or remedy the situation, then that could be grounds for finding Wedco liable. *See*

14  *Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864, 875 (9th Cir. 2001) (stating that liability for

15  harassment by a co-worker "kicks in" when the employer knows or should have known of the

16  conduct and fails to remedy the situation).

17       Finally, there is also a dispute over whether Potter heard Mitchell when Mitchell stated

18  that "someone should take it down."  While Mitchell admits that he did not use the word "noose"

19  nor did he gesture to the noose, he claims that Potter must have understood the comment.

20  (Mitchell Dep. 401:23–403:1).  The Court finds this to be weak evidence of knowledge.  Yet,

21  given all the circumstances alleged by Mitchell, a reasonable juror might conclude that Potter

22  affirmatively chose to dismiss Mitchell's statement rather than to inquire further because he was

23

24

14

not concerned about the noose's effect on Mitchell.  Accordingly, the Court finds that whether

Wedco had constructive knowledge of the alleged harassment is a question for the jury to decide.

Therefore, Wedco's motion as to the hostile work environment claim is DENIED.

**B. Constructive Discharge**

The EEOC additionally argues that Mitchell was constructively discharged from Wedco,

which would also constitute a violation of Title VII. *Penn. State Police v. Suders*, 542 U.S. 129,

141 (2004).  In determining whether an employer's actions constitute constructive discharge, the

court evaluates whether the working conditions became "so intolerable that a reasonable person

in the employee's position would have felt compelled to resign." *Id.*  The working conditions

must "deteriorate, as a result of discrimination, to the point that they become sufficiently

extraordinary and egregious to overcome the normal motivation of a competent, diligent, and

reasonable employee to remain on the job to earn a livelihood . . . ." *Brooks*, 229 F.3 at 930.

Moreover, a hostile-environment constructive discharge requires the plaintiff to show

"something more" than what is required under an ordinary claim of hostile work environment.

*Suders*, 542 U.S. at 147.  The Ninth Circuit has explained that:

> We set the bar high for a claim of constructive discharge because federal
> antidiscrimination policies are better served when the employee and employer
> attack discrimination within their existing employment relationship, rather than
> when the employee walks away and then later litigates whether his employment
> situation was intolerable.

*Poland v. Chertoff*, 494 F.3d 1174, 1184 (9th Cir. 2007).  Indeed, an employee who quits his

employment without giving his employer a reasonable chance to resolve a problem "'has not

been constructively discharged.'" *Id.* (quoting *Tidwell v. Meyer's Bakeries, Inc.*, 93 F.3d 490,

494 (8th Cir. 1996)).

1    Here, the EEOC fails to demonstrate that Mitchell was constructively discharged from his

2    employment.  First, the EEOC has not offered something more in the way of evidence than what

3    it provides to support its hostile work environment claim.  Any evidence indicative of

4    constructive discharge in this case is also used to support the EEOC's argument that Wedco

5    subjected Mitchell to a racially hostile workplace.  While the facts alleged to demonstrate a

6    hostile work environment may also contribute to an employee's constructive discharge, the

7    caselaw is clear that the plaintiff must provide additional evidence of extraordinary and

8    egregious discrimination. *See Brooks*, 229 F.3 at 930.  Otherwise, the heightened standard of

9    proof would be in word only. *See Suders*, 542 U.S. at 149 (stating that the "[c]reation of a hostile

10   work environment is a necessary predicate to a hostile-environment constructive discharge

11   case").

12    Second, the EEOC offers no evidence that Mitchell provided Wedco with a reasonable

13   opportunity to remedy the alleged racial harassment.  It is undisputed that Mitchell did not report

14   Wilson's use of the word "nigger" or that Wilson allegedly told racial jokes.  It is also

15   undisputed that Mitchell never directly reported his feelings regarding the noose or about

16   Wilson's comment that the noose was for Mitchell.  The times that Mitchell approached Potter

17   regarding Wilson's behavior, Mitchell did not indicate that he believed the conduct was race

18   based.  Based on these facts, a reasonable juror could not find that Wedco was given a real

19   opportunity to attack the discrimination.  Indeed, Mitchell's decision to walk off the job after

20   threatening Baker with the concrete lid is precisely the type of situation the Ninth Circuit

21   explained was contrary to federal antidiscrimination policies.  Rather than explaining that he

22   reacted so harshly to Baker's comment because he found it racially harassing, Mitchell instead

23

24

just walked away.  Accordingly, the Court GRANTS summary judgment in Wedco's favor on the EEOC's constructive discharge claim.[1]

**C. Disparate Treatment**

Finally, the EEOC's claim that Mitchell suffered disparate treatment in violation of Title VII is subject to the burden-shifting analysis outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  The test requires the plaintiff to show a prima facie case of disparate treatment. If the plaintiff is successful, the burden shifts to the employer to demonstrate that a lawful and legitimate reason was the basis for the adverse employment action, and not race. *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008).  If the employer articulates such a reason, the burden shifts back to the plaintiff to show that the reason proffered is merely pretext to cover racial animus. *Id.*  In addition, "[d]isparate treatment claims require the plaintiff to prove that the employer acted with conscious intent to discriminate." *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 854 (9th Cir. 2002), *aff'd by* 539 U.S. 90 (2003).

To establish a prima facie case of disparate treatment, the EEOC must show that (1) Mitchell belongs to a protected class; (2) he was qualified for his position; (3) he was subject to an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably. *Davis*, 520 F.3d at 1089.  The first two prongs are easily satisfied here.  Mitchell belongs to a protected class and he was obviously qualified for his position.  The EEOC claims that Mitchell suffered adverse employment action when Wilson denied him

---

[1] The Court notes that while a genuine dispute of material fact exists regarding Wedco's constructive knowledge of the alleged harassment, that dispute does not preclude summary judgment on the constructive discharge claim. Although an employer can be liable for a hostile work environment based on constructive knowledge, *see McGinest*, 360 F.3d at 1119, actual knowledge of harassment appears to be the more appropriate standard under a claim of constructive discharge.  If federal policy is better served when employers and employees "attack discrimination within their existing employment relationship," *see Poland v. Chertoff*, 494 F.3d 1174, 1184 (9th Cir. 2007), then an employee must bear some of the burden to ensure that the employer has actual knowledge of the discrimination. Moreover, if the discrimination is truly extraordinary and egregious such that a reasonable employee would rather quit than continue his employment, then it is likely that the employer has actual knowledge by way of reports or complaints from the employee. *See Brooks v. City of Manteo*, 229 F.3d 917, 930 (9th Cir. 2000).

breaks.  Wedco argues that Mitchell was not denied breaks, but that as a deliveryman his break

schedule was not routine like that of the employees who worked in the warehouse. (Potter Dep.

153:7–154:16).  Mitchell also claims that only he was denied breaks while the other deliverymen

were allowed to take regular breaks. (Mitchell Dep. 223:4–10).  The EEOC offers no evidence,

besides Mitchell's own testimony, supporting the allegation that he was denied breaks.

Moreover, the EEOC offers no evidence that the other drivers' break schedules were not also

unpredictable and changing due to their delivery assignments.  In fact, Mitchell admits that he

was unaware when the other drivers took breaks or how their break schedules actually compared

to his own. (*Id.* at 223:11–18).  Although the degree of proof required to establish a prima facie

case for Title VII claims on summary judgment is minimal, *Wallis v. J.R. Simplot Co.*, 26 F.3d

885, 889 (9th Cir. 1994), the EEOC must still provide some evidence that Mitchell's break

schedule was in fact reduced or altered more than that of the other drivers. *See Fairbank*, 212

F.3d at 531 (requiring the non-movant on summary judgment to show that a factual dispute truly

exists once the movant demonstrates an absence of evidence supportive of a claim).  Because the

EEOC has not done so, the Court finds that its disparate treatment claim fails.[2]

### D.  Investigation and Conciliation Efforts

Wedco also argues that the EEOC failed to conduct a genuine investigation regarding

Mitchell's allegations and that the EEOC failed to engage in good faith conciliation efforts,

which Wedco asserts are alternative grounds for granting its motion.  The EEOC contends that

the sufficiency of its investigation or conciliation efforts is non-justiciable.  At this time, the

Court declines Wedco's invitation to delve into the sufficiency of the EEOC's investigation.  The

text of the statute states only that the EEOC "shall make an investigation" of the allegations

---

[2] The EEOC also argues that Mitchell suffered disparate treatment due to his constructive discharge from Wedco. However, because the Court finds that the EEOC's constructive discharge claim fails as a matter of law, a disparate treatment claim cannot succeed on that theory.

1    raised by a "person claiming to be aggrieved." 42 U.S.C. § 2000e-5(b).  And while the

2    investigation must be "genuine," *EEOC v. Pierce Packing Co.*, 669 F.2d 605, 608 (9th Cir.

3    1982), the statute does not provide any textual directive as to the degree, thoroughness, or length

4    thereof.  What constitutes an "investigation" is left to interpretation.  Accordingly, the Court

5    finds that the sufficiency of an investigation is a matter of law that a jury does not resolve. *See*

6    *Cal. Energy Res. Conservation & Dev. Comm'n v. Johnson*, 807 F.2d 1456, 1461 (9th Cir. 1986)

7    (stating that courts are the final authorities on questions of statutory interpretation).  However,

8    the threshold question of whether the EEOC's investigation or conciliation efforts may even be

9    evaluated by a court is pending before the Supreme Court. *EEOC v. Mach Mining, LLC*, 738

10   F.3d 171 (7th Cir. 2013), *cert. granted*, 134 S. Ct. 2872 (Jun. 30, 2014) (No. 13-1019).  The

11   Court, therefore, limits its evaluation to whether the EEOC made any effort to comply with the

12   statute while reserving judgment regarding the sufficiency of those efforts.

13         The NERC conducted a number of interviews related to this case and compiled various

14   notes that it subsequently transferred to the EEOC pursuant to the two agencies' worksharing

15   agreement.  After a review of that file, an EEOC officer conducted an independent phone

16   interview with Mitchell to judge the legitimacy of his claims. (Escobar Dep. 51:2–24, ECF No.

17   110-18).  Once this evidence was gathered and assessed, the EEOC issued its Letter of

18   Determination. (EEOC Letter of Determination, ECF No. 110-19).  The Court finds that these

19   facts demonstrate that the EEOC made at least a minimal effort to satisfy its statutory

20   responsibility to conduct an investigation.  The Court reiterates, however, that it is reserving

21   judgment as to the sufficiency of the investigation.

22         Further, the Court finds that there are sufficient facts in the record to support the

23   inference that the EEOC made at least some effort to conciliate prior to bringing this suit.  The

24

1    statute requires that the EEOC "shall endeavor to eliminate any such alleged unlawful

2    employment practice by informal methods of conference, conciliation, and persuasion." 42

3    U.S.C. § 2000e-5(b).  The facts here indicate that the NERC and Wedco engaged in some

4    negotiations to resolve this case before Mitchell's file was transferred to the EEOC. (Hall Decl.

5    ¶ 4, Ex. 27, ECF No. 108-10; NERC Letter to Wedco, ECF No. 110-17).  Once the EEOC took

6    control of the case, it too engaged in conciliation efforts. (EEOC Letter to Wedco, ECF No.

7    109-5).  Wedco argues that these efforts were made in bad faith since portions of the damages

8    were either unjustified or exceeded the statutory limit.  However, Wedco does not offer evidence

9    that it made a counteroffer to the EEOC. (*See* Hall Decl. ¶ 4 (stating that a counteroffer was

10   made to the NERC, but not stating whether a counteroffer was also made to the EEOC in this

11   matter)).  Had Wedco made a reasonable counteroffer that was then rejected by the EEOC, there

12   would be a stronger showing of bad faith on the EEOC's part.  On these facts, though, the Court

13   finds that summary judgment on Wedco's alternative grounds is not warranted.  Nevertheless,

14   the Court also reserves judgment at this time regarding the sufficiency of the EEOC's

15   conciliation efforts.

16        Therefore, for the foregoing reasons, Wedco's motion for summary judgment is

17   GRANTED in part and DENIED in part.

18   **IV**.    **The EEOC's Motion for Summary Judgment on Wedco's Equitable Defenses**

19        The EEOC seeks summary judgment on a number of Wedco's equitable affirmative

20   defenses.  Specifically, the EEOC seeks summary judgment on Wedco's defenses of unclean

21   hands, estoppel, after-acquired evidence, waiver, consent, laches, statute of limitations, as well as

22   a number of defenses regarding the applicability of punitive damages in this case.  This motion,

23   like Wedco's motion for summary judgment, is evaluated under the legal standard set forth in

24

Part II of this Order.  The Court simply reiterates that it must make all reasonable inferences in Wedco's favor as the non-moving party in this motion, *Villiarimo*, 281 F.3d at 1061, and that summary judgment is appropriate only if the EEOC is entitled to judgment on the affirmative defense as a matter of law, Fed. R. Civ. P. 56(a).

**A.  Unclean Hands**

Wedco's ninth and sixteenth affirmative defenses allege that the EEOC or Mitchell engaged in inappropriate conduct that precludes equitable relief under the doctrine of "unclean hands."  The EEOC contends that there is insufficient evidence in the record to support such a defense.  The Court disagrees.  The doctrine of unclean hands "insists that one who seeks equity must come to the court without blemish." *EEOC v. Recruit U.S.A., Inc.*, 939 F.2d 746, 752 (9th Cir. 1991) (citing *Johnson v. Yellow Cab Transit Co.*, 321 U.S. 383 (1944)).  "The doctrine bars relief to a plaintiff who has violated conscience, good faith or other equitable principles in his prior conduct, as well as to a plaintiff who has dirtied his hands in acquiring the right presently asserted." *Dollar Sys., Inc. v. Avcar Leasing Sys., Inc.*, 890 F.2d 165, 173 (9th Cir. 1989). Further, the application of the unclean hands doctrine "raises primarily a question of fact." *Id.*

In this case, the record contains numerous facts leading to reasonable inferences that both Mitchell and the EEOC have acted in bad faith.  For instance, rather than reporting the alleged racial harassment to Potter or any other Wedco authority, Mitchell secretly took pictures of the noose and recorded days on which he was allegedly denied breaks. (Mitchell Dep. 181:11–13; 248:5–21).  Mitchell also told his girlfriend at the time that he planned to "sue Wedco for $20 million and never have to work again." (Zietche Decl. ¶ 11, ECF No. 115-1)  A reasonable juror could find that Mitchell "dirtied his hands" because he did not take any steps that would allow Wedco to remedy the situation and instead sought opportunities to build his case against the

company that hired him. *See Dollar Sys. Inc.*, 890 F.2d at 173 ("Bad intent is the essence of unclean hands."). After weighing the credibility of all the evidence, a jury certainly could find that Mitchell violated conscience and that his bad intent should preclude the EEOC's claims. *See EEOC v. Womble Carlyle Sandridge & Rice, LLP*, No. 1:13CV46, 2014 WL 37860, at *3–*4 (M.D.N.C. Jan. 6, 2014) (applying sanctions on the EEOC based on the claimant's conduct).

Moreover, it is undisputed that Maurice Davis, a Nevada Equal Rights Commission intake officer, shredded notes that he took during an interview with Mitchell. (Davis Dep. 31:12–18). While the Court in a previous ordered concluded that there was insufficient evidence of bad faith on Davis's part to justify spoliation sanctions, a reasonable juror could find that this conduct was both egregious and harmful, thereby precluding recovery. *See D.E. Shaw Laminar Portfolios, LLC v. Archon Corp.*, 570 F. Supp. 2d 1262, 1273 (D. Nev. 2008). Therefore, the EEOC's motion for summary judgment on this affirmative defense is DENIED.

**B. Estoppel**

Wedco's eleventh and twenty-ninth affirmative defenses allege that the EEOC's claims are barred by the doctrine of estoppel due to Mitchell's interference and refusal to participate Wedco's investigation of his claims. Again, the EEOC argues that there is insufficient evidence to support such a defense. "In order to establish equitable estoppel, '(1) the party to be estopped must be apprised of the true facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting estoppel has the right to believe it was so intended; (3) the party asserting the estoppel must be ignorant of the true state of facts; (4) he must have relied to his detriment on the conduct of the party to be estopped.'" *USF Ins. Co. v. Smith's Food & Drug Ctr., Inc.*, 921 F. Supp. 2d 1082, 1095 (D. Nev. 2013) (quoting *In re Harrison Living Trust*, 112 P.3d 1058, 1062 (Nev. 2005)).

Here, Mitchell was obviously apprised of all the facts that he alleges constituted racial harassment.  Rather than affirmatively reporting that he believed the noose to be racially offensive and that Wilson engaged in racially-based behavior, Mitchell secretly took photographs and secretly documented the alleged discriminatory behavior.  In the few times that Mitchell did complain to Potter regarding Wilson's conduct, Mitchell omitted his belief that Wilson's harassment was race based.  It is clear that there is some degree of responsibility on victims of harassment to report the offensive conduct to the employer. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 806 (1998) (stating that "a victim has a duty 'to use such means as are reasonable under the circumstances to avoid or minimize the damages' that result from violations of [Title VII]) (quoting *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231 n.15 (1982)).[3]  A reasonable inference from the presented facts is that neither Potter nor anyone with supervisory authority at Wedco was aware of the alleged harassment or any of the particular circumstances that Mitchell found to be racially discriminatory.  While those at Wedco had general knowledge regarding the noose, for instance, there is nothing in the record indicating that Potter knew it was racially offensive to Mitchell.  Because Wedco did not know of the alleged harassment, it could not take steps to remedy the situation, which was to its detriment given this lawsuit.  Moreover, Martin testified that after Mitchell left Wedco, she attempted to contact him multiple times to discover why he quit, but that Mitchell refused to speak with her. (Martin Decl. ¶ 8, Ex. 18, ECF No. 108-9).  Thus, a reasonable juror could find that Wedco is entitled to the estoppel defense.  And if the jury determined that Mitchell's claims would be estopped based on his behavior, it could also find that the EEOC's claims are likewise barred by estoppel. *See EEOC v. Dave's Detailing, Inc.*, 2008 WL 1968315, at *3 n.3 (W.D. Ky., May 2, 2008) (stating that "where equity would

---

[3] *See also* U.S. EEOC, EEOC Compliance Manual 15-43 (2006), *available at* http://www.eeoc.gov/policy/docs/race-color.pdf  (stating that the victim of harassment "should make sure management knows about the harassing conduct").

preclude a claimant from seeking relief, it also operates to preclude the EEOC from seeking

relief on the claimant's behalf").  Therefore, the EEOC's motion for summary judgment on this

defense is DENIED.

### C. After-Acquired Evidence

Wedco's fourteenth affirmative defense claims that recovery in this case is limited or

barred by after-acquired evidence.  The defense of after-acquired evidence may be applicable if

an employer discharges an employee for a discriminatory reason, but then later discovers that an

employee's own wrongdoing would have been independent grounds for termination. *See O'Day*

*v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 759 (9th Cir. 1996).  The employer has the

burden of not only establishing that it could have fired the employee for the conduct, but that it

"*would* in fact have done so." *Id*.  However, after-acquired evidence that an employee could have

been discharged for a legitimate reason does not protect the employer from liability. *See*

*McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 357 (1995).  After-acquired evidence of

an employee's wrongdoing instead "bears on the specific remedy to be ordered" for wrongful

termination. *See O'Day*, 79 F.3d at 759 (listing the various limits after-acquired evidence may

impose on the plaintiff's remedy).

The Court finds that the after-acquired evidence defense is inapplicable to this case.

Since Wedco did not terminate Mitchell's employment and the EEOC's constructive discharge

claim fails as a matter of law, Mitchell cannot seek relief for wrongful termination.  Thus, there

is no remedy to be ordered here for wrongful termination on which after-acquired evidence

might have some bearing.  Accordingly, the motion as to this defense is GRANTED.

///

///

1

**D.  Waiver**

2       Wedco's eleventh affirmative defense also alleges that the EEOC's claims are precluded

3  under the doctrine of "waiver."  Wedco withdraws this affirmative defense. (Def.'s Resp. 15,

4  ECF No. 115).  The Court interprets this withdrawal as Wedco's consent to summary judgment

5  on this defense.  Therefore, the EEOC's motion as to waiver is GRANTED.

6

**E.  Consent and Acquiescence**

7       Wedco's eleventh affirmative defense further alleges that the EEOC's claims are barred

8  by Mitchell's consent and acquiescence to any discriminatory conduct he allegedly experienced.

9  The EEOC argues that consent does not constitute an affirmative defense in Title VII cases, but

10  it cites no caselaw in support of that contention.  Mitchell did not report any of the alleged

11  harassing behavior, which a reasonable juror could infer means that he acquiesced to both the

12  hanging of the noose and Wilson's conduct.  Moreover, Mitchell himself told "racial jokes

13  regarding whites." (Gil Decl. ¶ 7).  A reasonable juror could infer that this conduct likewise

14  demonstrates Mitchell's consent to the racial jokes Wilson allegedly told.  Therefore, the

15  EEOC's motion on this defense is DENIED.

16

**F.  Laches**

17       Wedco's tenth and twenty-first affirmative defenses allege that the EEOC's claims are

18  barred by the doctrine of "laches."  Specifically, Wedco argues that the EEOC unreasonably

19  delayed in filing its lawsuit and that this delay caused Wedco prejudice.  "Laches is an equitable

20  defense that prevents a plaintiff, who 'with full knowledge of the facts, acquiesces in a

21  transaction and sleeps upon his rights.'" *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 950–51 (9th

22  Cir. 2001) (citation omitted).  "The defense of laches 'requires proof of (1) lack of diligence by

23  the party against whom the defense is asserted, and (2) prejudice to the party asserting the

24

1   defense.'" *Bratton v. Bethlehem Steel Corp.*, 649 F.2d 658, 666 (9th Cir. 1980) (quoting *Costello*

2   *v. United States*, 365 U.S. 265, 282 (1961)).  Here, Wedco argues that the four year delay

3   between Mitchell filing his Charge of Discrimination, which occurred on October 4, 2008, and

4   the EEOC filing this lawsuit, which occurred on September 27, 2012, is sufficient evidence of

5   lack of diligence on the EEOC's part to withstand summary judgment.  The Court agrees.  The

6   EEOC does not provide any explanation of why it waited so long before bringing the present

7   action.  While Wedco bears the burden to establish that the delay was unreasonable, *see Boone v.*

8   *Mech. Specialties Co.*, 609 F.2d 956, 958 (9th Cir. 1979), the absence of any explanation from

9   the EEOC of why it took forty-seven months to review the NERC's notes and conduct a single

10  interview could certainly be interpreted by a reasonable juror as a lack of diligence.

11          Moreover, there are sufficient facts in the record from which a reasonable juror could

12  find that Wedco was prejudiced due to the EEOC's delay.  It is beyond dispute that memories

13  fade over time and those individuals with personal knowledge of the circumstances surrounding

14  Mitchell's employment at Wedco surely remember less today than they did in 2008.  A

15  reasonable juror could find that Wedco was jeopardized by the EEOC's delay for this reason

16  alone.  Therefore, the EEOC's motion as to Wedco's laches defense is DENIED.

17      **G. Statute of Limitations**

18          Wedco's twenty-first affirmative defense also alleges that the EEOC's claims are

19  precluded by the statute of limitations.  Wedco withdraws this affirmative defense. (Def.'s Resp.

20  21).  The Court interprets this withdrawal as Wedco's consent to summary judgment on this

21  defense.  Therefore, the EEOC's motion as to the statute of limitations defense is GRANTED.

22  ///

23  ///

24

**H. Good Faith Efforts to Comply with Title VII**

Wedco's twentieth affirmative defense alleges that punitive damages are not appropriate in this case because Wedco made good faith efforts to comply with Title VII. The EEOC argues that there is insufficient evidence in the record to support this defense. The Court disagrees. The Supreme Court has stated that a company need not establish formal policies and procedures in order to comply with Title VII. *See Faragher*, 524 U.S. at 808. Wedco undisputedly took some measures to comply with the law. For example, Wedco displayed EEO posters in its warehouse. (EEO Posters, Ex. 4, ECF No. 115-4). Wedco also employed a Human Resources representative who management understood was available to help deal with allegations of discrimination or harassment. (Potter Dep. 72:4–5). Further, each time that Mitchell complained to Potter regarding Wilson's behavior, Potter attempted to resolve the issue by talking with Wilson. There is no indication why Potter would not have also worked to remedy the situation if Mitchell had reported the alleged racial harassment. A reasonable juror could infer from these facts that Wedco did make good faith efforts to comply with Title VII, but was not provided with an opportunity to address Mitchell's issues directly because it did not have knowledge of the harassment. Therefore, the EEOC's motion as this defense is DENIED.

**I. No Factual Basis for Punitive Damages**

Wedco's seventeenth affirmative defense claims that the EEOC's complaint fails to state facts that justify an award of punitive damages. Wedco withdraws this affirmative defense. (Def.'s Resp. 26). The Court interprets this withdrawal as consent to summary judgment. Therefore, the EEOC's motion as to this defense is GRANTED.

///

///

### J.  Constitutionality of Punitive Damages

Wedco's eighteenth and nineteenth affirmative defenses allege that punitive damages are unlawful in general and as applied to Wedco in this case under both the United States and Nevada constitutions.  The Court finds Wedco's defense that punitive damages under Title VII are generally unconstitutional to overly broad.  The statutes and caselaw clearly allow for punitive damages under the appropriate circumstances. *See* 42 U.S.C. § 1981a (stating that a complaining party may recover punitive damages in an action brought under 42 U.S.C. § 2000e-5); *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535 (1999) (discussing the framework for determining whether punitive damages are appropriate in a discrimination case).  Therefore, summary judgment is GRANTED on Wedco's general claim under both the federal and state constitutions.  However, its defense that punitive damages would be unconstitutional as applied to Wedco is a different matter.  Punitive damages are appropriate against an employer only if the employer's state of mind indicates that it acted with malice or reckless indifference that its conduct may be "in violation of federal law." *Kolstad*, 527 U.S. at 535.  Accordingly, even if the EEOC successfully proves that Wedco violated Title VII, the EEOC would also have to show that Wedco acted with the proper state of mind before punitive damages would be proper.  If punitive damages are, for some reason, assessed against Wedco in this case, Wedco should be allowed to challenge the sufficiency of the evidence pertaining to its state of mind.  This challenge could, in theory, include arguing against the constitutionality of the award if Wedco believes the requisite mental state has not been proven.  Therefore, the EEOC's motion as to this defense under the federal constitution is DENIED.

///

///

**V.     The EEOC's Motion for Summary Judgment on Wedco's Procedural Defenses**

The EEOC also moves for summary judgment on a number of Wedco's procedural affirmative defenses including satisfaction of conditions precedent, jurisdiction, and failure to exhaust administrative, statutory, arbitration and contractual remedies.  Once again, the Court applies the legal standard discussed above to determine whether a reasonable jury could find for Wedco on any of the challenged defenses with all reasonable inferences made in Wedco's favor. *See Diaz*, 521 F.3d at 1207.

**A.  Failure to Properly Conciliate or Investigate**

Wedco's thirty-fifth affirmative defense alleges that the EEOC failed to satisfy the conditions precedent to the initiation of this action because it did not properly conciliate or investigate Mitchell's Charge as required by statute.  As stated, the Court does find this issue to be a matter of law. *See supra* Part III.D.  Accordingly, it is not a question that the jury decides. Because the Court chooses to reserve judgment on the sufficiency of the EEOC's investigation and conciliation efforts, it finds that summary judgment precluding the defense would be premature.  Therefore, the EEOC's motion as to this defense is DENIED.

**B.  Subject-Matter Jurisdiction**

Wedco's eighth and thirty-fourth affirmative defenses claim that this Court lacks jurisdiction over the present action because of the EEOC's failure to conciliate or investigate as required by 42 U.S.C. Section 2000e-5(b).  The EEOC claims that it complied with all statutory requirements before filing its lawsuit.  While Wedco challenges the adequacy of the EEOC's measures, the Court agrees that there is factual support that the EEOC made at least a minimal attempt to comply with the statute.  An investigation was conducted first by the NERC and then by the EEOC, (*see* Escobar Dep. 51:3–7, ECF No. 110-18), and both the NERC and the EEOC

29

made conciliation offers, (*see* NERC Letter to Wedco, ECF No. 110-17; EEOC Letter to Wedco, ECF No. 109-5).  Since the statute directs only that an investigation "shall" occur and that the EEOC "shall endeavor" to conciliate, 42 U.S.C. § 2000e-5(b), the Court can find that it has jurisdiction over this case without making any ruling on the adequacy of the EEOC's efforts. *Cf. Pierce Packing Co.*, 669 F.2d at 607–08 (affirming decision that district court lacked jurisdiction because EEOC *completely* failed to conduct an investigation or engage in conciliation). Therefore, summary judgment on this defense is GRANTED.

### C.   Failure to Exhaust Administrative Remedies

Wedco's second and twenty-eighth affirmative defenses allege that Mitchell and the EEOC failed to exhaust administrative and statutory remedies prior to filing the present action. The EEOC, however, argues that Mitchell did in fact comply with the statutory requirements resulting in exhaustion.  The EEOC also argues that it is not subject to the exhaustion of administrative remedies before bringing suit.  The Court finds that Mitchell satisfied all statutory requirements in this case.  A complainant must timely file a charge of discrimination with the EEOC or local or State agency within 180 days of the of the alleged unlawful employment practice. 42 U.S.C. § 2000e-5(e)(1).  If the charge is first filed with a local or State agency, that agency is given a period of time to investigate the charge before referring it to the EEOC. 42 U.S.C. § 2000e-5(d).  Once the EEOC issues the complainant a right to sue letter, the complainant has ninety days to bring suit in federal court. 42 U.S.C. § 2000e-5(f)(1).  Here, Mitchell's Intake Inquiry Form was submitted to the NERC on August 21, 2008 and claimed that the last act of discrimination occurred on July 24, 2008. (Intake Inquiry Form, Ex. 14, at 247). Mitchell's Charge was subsequently filed with the NERC and the EEOC on October 4, 2008, and Wedco was sent notice of the Charge on October 15, 2008. (Notice of Charge of Discrimination,

1    ECF No. 110-14).  These dates indicate that all of this transpired well within the 180-day period.

2    Mitchell himself did not file suit, so the ninety day limit is inapplicable to this case.

3    Accordingly, the Court finds that Mitchell did not fail to exhaust administrative remedies.

4           Further, the Court understands Wedco's arguments regarding the EEOC's failure to

5    exhaust to be akin to its argument regarding the sufficiency of the EEOC's investigation and

6    conciliation efforts.  This rendition of Wedco's arguments fails for the same reasons set out

7    previously—that is, there is evidence in the record that the EEOC conducted an investigation and

8    engaged in conciliation efforts.  The Court need not evaluate the sufficiency of the EEOC's

9    actions to conclude that some effort was made.  Therefore, the EEOC's motion for summary

10   judgment as to Wedco's exhaustion defense is GRANTED.

11   ///

12   ///

13   ///

14   ///

15   ///

16   ///

17   ///

18   ///

19   ///

20   ///

21   ///

22   ///

23   ///

24

**CONCLUSION**

IT IS HEREBY ORDERED that Wedco's Motion for Summary Judgment (ECF No. 108) is GRANTED in part and DENIED in part.  Summary judgment is GRANTED as to the EEOC's disparate treatment claim and constructive discharge claim, but it is DENIED as to the EEOC's hostile work environment claim.

IT IS FURTHER ORDERED that Wedco's Motion to File Under Seal (ECF No. 106) is GRANTED.

IT IS FURTHER ORDERED that the EEOC's Motion for Summary Judgment on Wedco's Equitable Defenses (ECF No. 109) is GRANTED in part and is DENIED in part.  The motion is GRANTED as to the affirmative defenses of after-acquired evidence, waiver, statute of limitations, and the factual inadequacy of the EEOC's complaint regarding punitive damages. The motion is DENIED as to all other equitable affirmative defenses.

IT IS FURTHER ORDERED that the EEOC's Motion for Summary Judgment on Wedco's Procedural Defenses (ECF No. 110) is GRANTED in part and DENIED in part.  The motion is GRANTED as to the affirmative defenses of jurisdiction and exhaustion.  The motion is DENIED, however, as to Wedco's thirty-fifth affirmative defense.

IT IS SO ORDERED.


Dated:  December 4, 2014

_____
ROBERT C. JONES
United States District Judge